The former university officials here are entitled to qualified immunity because it was not clearly established that a non-tenured lecturer had a constitutionally protected property right in his contract renewal. Similarly, the department chair here is immune from a tortious interference with contract claim because her actions surrounding the contract renewal were within the scope of her employment. Wilkerson, the lecturer here, and by extension the district court, pointed to one case that purported to show that there was a clearly established constitutionally protected right in Wilkerson's contract renewal. That's the Perry v. Sinderman case from 1972 from the Supreme Court. That case is a de facto tenure case. What was at issue there was a teacher at a junior college that did not have a formal tenure system, and the teacher's contract was silent on the issue of tenure. Given those circumstances, the court held there that the teacher could point to other facts to show that she had a claim to de facto tenure like formerly tenured teachers at other schools. Importantly, however, that case as it's been understood in this circuit is that it applies in the context of finding de facto tenure where a system of tenure does not already exist. It is undisputed that the University of North Texas here has a formal tenure system, and that Mr. Wilkerson did not have tenure and was not on the tenure track. But their argument's a little more nuanced in that they're saying there's this intermediate category, which were these term employees, and he had a five-year term embedded in his contract because the bylaws are incorporated into it. And so the Snyderman analysis applies. Well, they're saying that they are making the claim for this sort of quasi-tenure right in that way. The issue is that this is up on a qualified immunity context, and Perry v. Snyderman has been interpreted consistently by this court as simply applying any de facto tenure context. There's the Batterton case where it says that Perry v. Snyderman, what it stands for is that an informal understanding may lead to a property interest in the absence of officially promulgated position. And the Staheli case a couple years after that said that if there is a formal tenure system in place, that necessarily means that teachers that don't have tenure are not assured of continuing employment. Here, the university's expressed in many different ways that even in the lecturer position that's at issue here, even assuming if Perry v. Snyderman could be read to apply to that circumstance, and we would hold in the qualified immunity context, because no court has applied it in that context, and the other side has basically admitted this in their response brief that there's no case on point talking about these types of circumstances, then we should have qualified immunity. But even there, the contract with Wilkerson here was not a five-year term contract. The contract provided that his was a temporary non-tenurable one-year appointment with a five-year commitment to renew at the option of the university. This was also backed up in various ancillary documents at the university. The college constitution made clear that renewals of term appointments are entirely at the option of the university. The department bylaws said that there is no expectation of continued employment beyond the current appointment period. So given those circumstances, given the language in the contract, given the language in the department bylaws and the college constitution, it was reasonable for university administrators to believe that Mr. Wilkerson did not have a constitutionally protected property interest in being reappointed year after year. You have a very good district judge here. I'm sure you agree with that. Where, in your view, did he go wrong in the reasoning? What caused this result that, of course, you say is erroneous and needs to be reversed? I think that on this issue of the constitutionally protected property right, the judge went wrong in focusing too much on Perry v. Sinderman at a broad level of generality and losing scope of the fact that this is a qualified immunity case. They were brought to his attention, yes. And he said, he discussed these various cases and he said it appears from some of these cases that Perry v. Sinderman had been, I think he used the term abrogated or purported to be abrogated, but it was his contention that a close reading of these various cases kept a broad reading of Perry v. Sinderman possible. We believe in the qualified immunity context where things have to be spelled out with a high degree of particularity, things need to be especially clear, and the standard is whether it would be plainly incompetent for these administrators to believe this. We think that in that context, it's not clearly established from Perry v. Sinderman that a lecturer in this type of position had a constitutionally protected property right to renewal. I think even though, even assuming that there were a clearly established constitutional property right to renewal, there's an independent way that this Court could resolve that first issue, and that is that although the university was not obligated to, the process that according to Wilkerson's very own allegations, he was afforded representation. He availed himself of that in a grievance hearing. He was able to call witnesses, confront witnesses, cross-examine witnesses. He could introduce and object to evidence. He was able to make his case directly to the college president. He had, in essence, after he received his non-renewal letter, there was a first a grievance committee that met where he received all of this process. It went up to the college dean to be decided. He was able to meet with the college dean and present his case. It then went to another ad hoc committee of faculty from the university as a whole who were neutral and detached, who considered this, who interviewed all these witnesses, and then it went up to the university provost. There is no case, certainly not a case, that Wilkerson has pointed to that said that any of that is even required. All he is entitled to, even again assuming that he had this right, is the constitutional minimum of notice and opportunity to respond, and he had that beyond that. On the second issue, which is the tortious interference with contract issue, to keep this in the same guise, I think where the district court went wrong here, and it's not entirely clear to me why this was the case, was that he did not Texas Tort Claims Act. This was presented to the district court. I have a few record sites. It was first raised to the district court in, I believe, a motion opposing a request to amend the complaint. That was at 235 of the record. Most importantly, 101-106 was raised in the motion to dismiss itself. That's at page 285 of the record. And then it was reaffirmed at page 435 of the record. And what's important about 101-106 is that as a practical matter in the State of Texas, there isn't really much discussion about common law official immunity anymore, because that's a three-pronged matter of there has to be a discretionary act, it has to have been within the scope of employment, it had to be within good faith. Under 101-106 for these types of tort claims, the only issue is whether it was within the scope of employment. 101-106-F, which was quoted in full to the district court at those various pages that I gave you, says that if a suit is filed against an employee of a governmental unit based on conduct within the employee's — within the scope of the employee's employment, and it could have been brought against the government under that chapter, then upon a motion from the employee, within 30 days, if they don't amend to name the governmental unit, it must be dismissed against the employee. This is talked about mostly in the Ngakwe case, the Franca case goes on about the power of this. And it really — the practical matter of it is, is that if the government employee for this type of tort claim — and this is a tort claim that's covered by the Act. This has been decided by Texas courts. If that employee were acting within the scope of her — of his or her employment, then as a practical matter, it's as if it's suing the government itself. And because the State of Texas has not waived immunity for this type of claim, the claim essentially goes away. We believe that the district court erred here in taking too granular an approach to the scope of employment issue. This can be seen in lots of cases. This may be best explained. There's the city of Lancaster case out of the Texas Supreme Court. This dealt with police officers, and there the — the court of appeals had held. These were police officers who were speeding and driving fast in the streets in order to pursue a suspect. And the argument was made, well, the police officers, it's outside the scope of their employment to do these various reckless things. They weren't supposed to do it. It wasn't justified in the circumstances. And the court of appeals said, well, if that's true, then it's outside the scope of their employment. The Texas Supreme Court reversed because it said that these police officers were on duty in a squad car pursuing suspects, and that it misperceives the scope of the — of the scope of employment It's during work time. It's consistent with her duties as the department chair, but it's exactly forbidden in the policy. So it is an employment decision, but it's explicitly prohibited. Would that still be within the scope? Is there anything — it's really easy to see the ones that are outside completely the scope, but I didn't know whether city of Lancaster meant that even if you're speeding and you're told you can't speed, that's still within the scope. I don't know what the — what the situation would be in that scenario. I don't think that's the case here because the — the constitution of the department bylaws here do give Glazeburg as a department chair an integral role in the hiring and firing process and making personnel decisions. She's essentially — she acts as akin to the CEO of the department. The — really, the only issue here — She's the one who hired him before? She's the one who recommended his hiring, yes. Yes. It mentions in the — in the letter, it says, you know, this was all at Patricia Glazeburg's, you know, suggestion, we're hiring you, and — for this type of lecturer position. And there's really no issue that she can, as she did here, elevate her concerns about whether to renew a contract to the — to college and university officials, which is what she did here. She communicated with university officials before sending out this letter. The only issue is that if you were to follow some technical provisions in the department bylaws, she's also supposed to consult with the faculty and send up their recommendations. So there's sort of two independent recommendations that go up. But one of them is hers. So it's — it's not the case that she is — she's forbidden from doing this. This is really — but I think as far as what type of deviation is acceptable, maybe the broadest one to me is this — this Jackson v. TSU case. This was a Southern District of Texas case. I think it was a Judge Harmon opinion. And there you had two professors who were proctoring exams, and one of the professors allegedly assaulted the other. And the issue there — surely he did not have authorization to do that, but the — the court surveyed Texas law and the breadth of the scope of employment analysis and held that even there, because he was proctoring an exam and that was part of his activities, that that deviation still fell within his scope of employment and barred suit. That was a 101-106 case itself. Sotomayor, if you win on this, what's the relief? Is there still an opportunity to substitute? Well, I think as a practical — I don't know whether there's still opportunity to substitute. The practical matter, and this is discussed in the Franca case, is that whether there's a substitution or not, they can't pursue this relief against the university. It essentially forecloses suit because the university has not waived sovereign immunity. Is there another provision that would allow substitution? Another basis for official immunity? Well, there's another basis for official immunity, common law official immunity. That wouldn't involve substitution. That would just kick the claim entirely. The difference there, why I say it would be easier to resolve this on the 101-106 ground is because there's just the one issue of scope of employment to deal with. There, you have discretionary act, which this is clearly a discretionary act. The Korzelman case dealt with a department chair and said that department chair's actions are discretionary. It kind of looks at their role as a whole. The district court didn't even address that issue. It was never raised below, probably because it was obvious it was a discretionary act. But it would also require getting into good faith. As we discuss in the brief, although the district court purports to rely on, say that there are fact issues there, we think that the district courts, akin to the scope of employment analysis, got the law wrong in the sense that the good faith analysis focuses on whether a reasonably prudent official could have believed that his or her conduct was justified under the circumstances. It is Wilkerson's burden to prove that no reasonable department chair in that same position would have taken similar action. We don't think that the district court held them to that standard. There were lots of issues in this case. I think we discussed this in the brief about issues in the department, about sexual harassment, communications from the OEO and others about the need for confidentiality in these things that justified some of the factual circumstances that the district court relied on to keep this case alive. But with that, I'll just save my time for rebuttal. Yes, you've saved time for rebuttal, Mr. White. Thank you. Mr. Whitten. May it please the Court. What was inadequate about the process that was provided here? It came after the fact that the horse was out of the barn. It has to be before the firing to meet the standards of due process. He was fired, not told why he was fired. He wasn't fired. He just wasn't renewed. Well, that's the issue, Judge, I think. No, there's no question he wasn't renewed. Well, he no longer had a job. But the question is, is it a non-renewal or is that a pretext for firing him for cause? Because they came up with this poor judgment without defining what you're talking about with poor judgment. So without discovery, which we haven't had in this case because we can't depose any of these people until we decide the qualified immunity issues, I can't really answer that question. I've got suspicions of what it is, but I don't really know that. Well, if he'd been discharged during the academic year, that might be called being fired or discharged. But he wasn't discharged. He just wasn't renewed. Maybe it's a distinction without a difference, but it is a distinction. Well, of course, I guess that depends on what term was he employed for. When they used the term, let me see. It wasn't undisputed his salary was for nine months. You know, I think he was only 12 months, but I'm not sure, Judge. I've seen that, but I can't remember which one it was. Here are the things that we think support the fact that he had a five-year agreement as opposed to a series of one-year agreements. And I realize there's language in a letter which they hang their hat on and say that's all there is to this contract, that one sentence. But we believe that their own rules and regulations form a part of this contract and that they're obligated to follow those. And when you construe this all together, this man had a term appointment for five years. When he was first hired, their internal documents said they'd open a new position for a five-year continuing principal lecture position. Previously, he'd signed term-of-years contracts up through up until 2011. Then they presented him this five-year agreement. He signed it. He didn't sign another one after that. He was terminated within that five years. There was never a renewal or a he was never asked to sign another agreement, which you would expect him to be if these were a series of one-year contracts. Also, it didn't make any sense. Did he receive a letter each summer for want of a better term that he would be teaching the next year? No. He didn't receive any of that. The only thing he got is he got pay raises as a continuing member of the faculty would have gotten. But he did not get that. He wasn't evaluated each year. He was evaluated in 2013. I think that was from 2011 to 2013. Why isn't the contract in the bylaws, why isn't it all consistent with them exercising their option to renew, but he understanding that his appointment is just as all these documents seem to say for one year and it's not tenured? Why doesn't it all make sense on that? Judge, I don't think we have to argue that he's got tenure. You agree he doesn't have tenure. I don't think he does. I think he's got a five-year contract that they breached. But everything says his contract and the bylaws are pretty crystal clear. It's a one-year contract with the university's option to renew, which they then— It does say that, but— All right. It says that appointments are for one or multiple years that are renewed pending the departmental annual review process and resource availability. So that means he's got to pass the review that he's doing good work, which he did, and whether the university has the resources available. If they run out of resources or decide to drop the courses that he teaches, then he could be through. They could get out of the contract on that, but they can't just say, you know, we don't want you anymore. And then it says there shall be no expectation of continued employment beyond the end of the current appointment period. Well, the appointment period is five years, not one year. Well, all of this maybe goes more to the merits than to qualified immunity because we're dealing with qualified immunity. So the fact that it's an argument over the term of the contract, et cetera, might even give further support to qualified immunity. Well, I can see that argument, Judge. Of course, they have briefed and say we don't have any kind of contractual agreement other than just a one-year at-will agreement. Why would you have a five-year term if everybody's an at-will employee? Well, the whole idea of three- to five-year term agreements doesn't make any sense. The review, it talks about the multi-year commitment is reviewed and renewed annually. This process provides an opportunity for termination during the multi-year term if needed. We think the proper construction of that is he's reviewed as to his job performance. He did a good job. There's no question about that. If we have a reduction in force or something like that, then that could possibly affect this or a serious violation of university policy. What else would if needed mean? It would be a necessity, something that's necessary. And if he falls down and doesn't do a good job, he was rated the second best teacher in the department. Mr. Whitten, I want to belabor it, and I'm only one of three, but it seems to me you're arguing the merits and you're not arguing qualified immunity or why it's not applicable. Well, the reason is that they've taken the position that we don't have a property right, and they say, therefore, we don't have a property right. Then they say we don't have qualified immunity. All right. We believe that we've got this agreement. We believe that the chairman of the department has no authority to fire him without the concurrence of the members of the professional affairs committee and the executive committee. She did this all external to them. I mean, her authority to terminate an employee, whether he's an at-will employee or not, depends upon the concurrence of those people. She never brought it to them. And when she was called on this, she said, well, you know, I thought I was barred by this confidentiality of the OEO matter. Well, our position is on the OEO matter. He was exonerated. They found he didn't violate the consensual conduct agreement, and he didn't. There was no evidence or insufficient evidence that he violated the sexual harassment policy. So if they have a system for taking care of that, can the department chair then say, well, I don't care what it says. I'm going to terminate you anyway, which is what she did. Do you have a case applying Sinderman so that the issue is beyond debate in a context where there is a tenure system and the employee claiming a property right didn't have tenure? Your Honor, I couldn't find that case. Yeah. But we believe if you look at the Texas law, there's a Texas case that says, Lee Wright v. Hall says if it's a term of years contract, there has to be cause for the termination. It can't be a non-renewal. That's what we believe we have here. We believe if you take that case and the other language of the Perry case, which says the circumstances, I'm trying to remember exactly how it's phrased here, but where You add Glazebrook's statements explaining this. You add the rules, which seem to dovetail with that. And then you have The policies of the university pertaining to the termination of tenured faculty and the non-renewal of tenure-track faculty, then we think that's going to create at least a question of fact. And as I understand what's before us today, this Court is not in a position to find facts. It has, on the motion to dismiss, it has to consider our live pleading. And on summary judgment, it has to consider the summary judgment evidence in the light most favorable to Mr. Wilkerson. On the second issue, what's your best case? She was not acting within her scope. Well, she went out on her own. She didn't tell anybody in the department. What's your best case, not the facts? It shows an official with her responsibilities entitled in the letterhead in the past that she'd done was outside the scope of her responsibilities, deciding not to renew them. Well, I think the rules that she's operating under, the university rules themselves prohibited this. I don't think when she goes as far as she did, it's ultra-virus beyond the scope of her employment. Just because she's department chair doesn't mean that she can fire anybody without going by at least paying some lip service to the rules, which she didn't. She didn't, and she knew she didn't. She admitted she didn't. So the immunity on the It's our position that in some instances, the at-will doctrine would bar a tortious interference with contract claim against a manager based on his decision to discharge an employee. But, and I think this is cited in Judge Mazzant's opinion, agents can be liable for tortiously introducing a breach if, for example, they act outside the scope of their agency. We don't think this is just a minor infraction of some university rule. We think it's a total abrogation and failure to even recognize that those rules exist. And when she was called on it by the members of the executive committee and the personal affairs committee, she refused to talk with them and discuss it with them. So if you have an employee that goes so far beyond what her obligations would be, we think that is an ultra-virus act that says that she didn't. All right. The Albright case, I guess, is the three things that we need. Official acts, the doctrine of official immunity is the official acts within the scope of his employment, the official performs a discretionary, not a ministerial act, and the official acted in good faith. Judge Mazzant cites in his two opinions the circumstances that indicate that she was not acting in good faith. So we don't believe she could claim official immunity. But what I'm most concerned about here is even if the non-renewal was not a pretextual firing for cause, which we believe it is, that action was arbitrary and capricious. Thus, that in and of itself we believe is actionable. The North Texas policies, bylaws, and practices, that customs and practices are all to be considered. And I think 1983 itself discusses that customs and practices can be considered in determining whether there's a violation of 1983. They cite this Loudermill case, Cleveland Board of Education versus Loudermill, a Supreme Court case. Due process provides that certain substantive rights cannot be deprived except pursuant to constitutionally adequate procedures. The right to due process is conferred not by legislative grace but by constitutional guarantee. An essential principle of this is that a notice of the reasons for termination must precede the hearing once he was fired or non-renewed, whichever you want to call it. He was then, without hearing, without knowing what he was being terminated for, basically placed in the position of being an appellate. In their position that they can fire him without, and then the second hearing did abrogate that. Case after case it says the right to notice must precede the hearing. You can't find him guilty without hearing. Then say we're going to give you an appeal, which is what happened. Then to top that off, she wouldn't cooperate with the appeal. You can see what the Arts and Sciences Committee, they said she lied, that she wasn't cooperative, stonewalled. So this is a case of a woman going so far beyond the bounds of her employment that you can't really say that a subsequent appeal restores the right of the teacher to due process. Then she misrepresented the facts to the dean, claiming that he had, that Wilkerson had authority over this young lady and was director of graduate studies when he wasn't, and that's irrefutable. His testimony, the testimony of the actual director of graduate studies is all in there. He didn't have any authority over her at the time this incident happened. So if this was about the incident, the alleged sexual harassment incident, then the basis for that did not exist because he had no authority over this CB. All right. Thank you, Mr. Whitten. Your time has expired. All right. You've saved time for about a minute. I just want to highlight a couple things. This was not a term of years contract as that is normally understood. I think that if this were a standard breach of contract action, we could maybe quibble over what sort of rights are going on here. But, again, this is a qualified immunity case. Given the language that's in the contract, in the constitutional bylaws, in the department bylaws, I mean, at best, there might be some unclear phrases discussing various things. But it was not unreasonable for administrators looking at language saying, this is an option of the university to renew this. It's entirely at your option. There's no expectation of continued appointment and concluding that it could take this action and not renew him for a subsequent year. Importantly, in terms of when the notice was provided for due process purposes, this letter went out to Wilkerson, I believe it was July 3rd or so, in the summer before the next academic year. The first committee that held its hearing, I believe it issued its report just a few weeks later. That also happened in July. So all of this, the process is already well underway before the next academic year starts. As a practical matter, Wilkerson's renewed teaching contract wouldn't begin until, I believe, August 25th of that year. I don't think there's anything in the record, this question came up over whether he was paid for the full year. I do know that his offer letters all quoted him a nine-month salary, and I think that he could elect to have that spread out over 12 months so that he wouldn't go without pay for three months. But his duties were nine-month duties, that is clear in the record. So all of this went on, the process began, in between the two academic years. And just on the point of qualified immunity, there are two particular concessions made by Wilkerson that I just want to highlight. On page 31 of his response brief, even on his own theory, he admits that this is at best unchartered territory. This deals with the Perry v. Sinderman issue. He says that as far as plaintiff knows, no case has determined whether a contract for a term of years may be terminated in the middle of the term except for cause. Now, it's our position that this contract was not terminated in the middle of the term, that it was a temporary, nontenurable one-year appointment. But again, even on his own theory, in the qualified immunity context, we think that that should be decided in favor of the administrators, if there's nothing that the other side points to who bears the burden of showing that qualified immunity doesn't apply. The other concession is on page 27 of the response. That is that neither UNT nor the College of Arts and Sciences appears to have an overall written policy regarding the termination and non-renewal of lecturers in general. And so we think that's one where, even if, even under this very broad reading of Perry v. Sinderman, even ignoring the various Fifth Circuit cases that have taken a narrower reading of that case, we think this is just not a Perry v. Sinderman case. In Perry, there was language in the college constitution or the faculty handbook or something like that that said something very broadly to the effect that we'd like to think that all of our teachers have tenure if they do X, Y, and Z. And the Supreme Court pointed to that when it was looking to other things to establish a de facto tenure. Here, the other side has admitted it doesn't have that. So this is really a case... Does the record reflect this department, what the ratio is of tenure track to lecturers? I don't believe so, no. I think there was only one lecturer of Wilkerson's position. I don't even know how many other types of lecturers there were or how many tenure or non-tenure... I don't think any of that is in the record. I've never seen it. I think... And just to address it, this issue of poor judgment, this is not... This is what Glazebrook said in her letter where she indicated the university would not be renewing the contract. This was fleshed out in the process that Wilkerson received at the university. It became clear quite early on that the poor judgment that they were pointing to, not that they need to come up with a reason, but the one that they pointed to was related to his actions of having a relationship, whether consensual or not, and whether he had been appointed the director of graduate studies or not, with a student. There are policies, sexual harassment policies, that say that even consensual relationships between faculty and students are not allowed. And this was not just the department chair. The dean cites this in his letter. The university provost cites this. The detached neutral faculty panel and the ad hoc grievance committee all talk about a display of poor professional judgment. So that is not the action of one person, and that has been considered by many people. All right, thank you.